```
1                  UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                               No. 1:21-cr-10012-WGY-1

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    YOHANNA MADELENNY BETANCES

10

11                        * * * * * * * *

12

13                     For Hearing Before:
                       Judge William G. Young
14

15                        Change of Plea

16
                       United States District Court
17                     District of Massachusetts (Boston.)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Thursday, July 25, 2024
19

20                        * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhr3tubas@aol.com

25
```

```
1                    A P P E A R A N C E S

2

3    K. NATHANIEL YEAGER, ESQ.
        United States Attorney's Office
4        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5        (617) 748-3311
         E-mail: Nathaniel.yeager@usdoj.gov
6        For the United States of America

7

8    AMY BARSKY, ESQ.
     WILLIAM W. FICK, ESQ.
9        Fick & Marx, LLP
         24 Federal Street, 4th Floor
10       Boston, Massachusetts 02110
         (857) 321-8360
11       Email: Abarsky@fickmarx.com
         For the Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:30 a.m.)
 3          THE CLERK:  Now hearing Criminal Matter 21-10012,
 4     the United States of America versus Betances.
 5          THE COURT:  Good morning.  Let's start by swearing
 6     the interpreter.
 7          (THE INTERPRETER, sworn.)
 8          THE COURT:  And would counsel identify themselves.
 9          MR. YEAGER:  Good morning, your Honor, Nathaniel
10     Yeager for the United States.
11          MR. FICK:  Good morning, your Honor, William Fick
12     and Amy Barsky for Ms. Betances.  Under the CJA rules,
13     I'd like to request that Ms. Barsky to take the lead
14     today.
15          THE COURT:  And she may, and she is of course
16     welcome.
17          MR. FICK:  Thank you, your Honor.
18          MS. BARSKY:  Thank you, your Honor.
19          THE COURT:  My I inquire of Ms. Betances about,
20     um -- no, do I understand that she desires to tender a
21     plea of guilty here?
22          MS. BARSKY:  Yes, your Honor.
23          THE COURT:  She may come forward to be inquired
24     of.
25          (THE DEFENDANT, sworn.)
```

1          THE COURT:  Would you state your full name.

2          THE DEFENDANT:  Yohanna Madelenny Betances.

3          THE COURT:  And, Ms. Betances, my name is Bill

4    Young, I'm the judge who presides in this session of the

5    court.  When I asked your attorney, she said you were

6    prepared to plead guilty to certain counts of this

7    indictment.  Before I can let you plead guilty, and it's

8    up to me, I have to find out certain things.

9          I have to find out that you know what you're

10   doing.  I have to find out that you truly understand

11   what you're giving up because you give up things that

12   are very important to you if you plead guilty.

13         I have to find out that you understand what you

14   may be letting yourself in for, what may happen to you

15   if you plead guilty.

16         I have to find out that you're pleading guilty

17   voluntarily, that you want to plead guilty.  Not that

18   you're happy about pleading guilty.  But you are in the

19   driver's seat as to whether you'll plead guilty.

20         I have what appears to be a plea agreement between

21   you and the government.  I'm not part of that.  But you

22   don't have to go through with that, you don't have to

23   plead guilty.  And if you'd rather have a trial, that's

24   one of your rights is to have a trial, I won't be angry,

25   disturbed in any way, and I'll never punish you for

1    that.

2         If we go to trial, well there's no plea agreement

3    then, and if you're found guilty, oh, I may punish you

4    for the crimes that you've committed, but I'll never

5    make it more harsh because you went to trial, because

6    having a trial is one of your rights.

7         Do you understand that you are choosing to plead

8    guilty here?

9         THE DEFENDANT:  Yes, I understand.

10        THE COURT:  And lastly, I have to be sure that the

11   government has enough evidence that if we did go to

12   trial, you could be found guilty of these charges, and

13   for that I'll ask the government's attorney, and you

14   listen to what he says, because I'm going to ask you

15   whether that's true.

16        Now to find these things out, you and I are going

17   to talk, I'm going to ask you questions.  If you don't

18   understand a question I'm asking you, stop me, I have to

19   ask it in a way that you understand.

20        If at any time you want to talk with Ms. Barsky --

21   that's why she's come up to stand beside you, I'll step

22   away, you and she can talk, because she can advise you

23   throughout this whole process.

24        Also, if at any time you want to stop, you don't

25   want to plead guilty, just tell me you want to stop,

```
1    we'll stop right then, and we'll get your case ready for

2    trial.

3            Do you understand?

4            THE DEFENDANT:  Yes, I understand.

5            THE COURT:  Let's start with the "Do you know what

6    you're doing?"

7            How old are you, ma'am?

8            THE DEFENDANT:  37.

9            THE COURT:  How far did you go in school?

10           THE DEFENDANT:  I finished high school in Santa

11   Domingo.

12           THE COURT:  Have you ever been treated for a

13   mental illness or mental condition of any sort?

14           THE DEFENDANT:  No.

15           THE COURT:  Are you taking any medication today?

16           THE DEFENDANT:  No.

17           THE COURT:  Are you under the influence of any

18   drug?

19           THE DEFENDANT:  No.

20           THE COURT:  Are you under the influence of

21   alcohol?

22           THE DEFENDANT:  No.

23           THE COURT:  Do you know what you're charged with

24   to which you're prepared to plead guilty?

25           THE DEFENDANT:  Yes.
```

1          THE COURT:  Tell me generally.

2          THE DEFENDANT:  Possession with an intent to

3     distribute, that's what I understand.

4          THE COURT:  And it isn't a test, but that's right.

5     And there's also a charge of conspiracy to possess with

6     intent to distribute and to distribute 400 grams or more

7     of fentanyl.

8          Now for conspiracy the government has to prove two

9     things.  The first thing they have to prove is that you,

10    knowing what you were doing, you conspired with at least

11    one other person.  And they've charged another person

12    here, they've charged this Luis Miguel Sanchez.  So they

13    charged that you and Mr. Sanchez conspired together.

14         Now you're not guilty of conspiracy just because

15    you knew him.  You're not guilty of conspiracy because

16    he was a friend or you were involved with him in some

17    way.  You're not guilty of conspiracy even if you knew

18    he was engaged in distributing drugs and you didn't

19    report it.  You're only guilty -- can be guilty of

20    conspiracy if you, knowing what you were doing, and he,

21    knowingly, the two of you agreed to do the specific

22    thing that violates the law.  And the agreement doesn't

23    have to be in writing, it doesn't have to be a wink or a

24    nod, but it must be a genuine agreement.  That's the

25    first thing.

1     Now the second thing, the government has to prove

2    specifically, what specifically is in Mr. Sanchez and

3    your head, what's in your mind, what's the deal?  And

4    the deal that they charge here is that you agreed to

5    possess with intent to distribute and to distribute 400

6    grams or more of fentanyl, a controlled substance that

7    you have no right to.  So what does that mean?  It means

8    the government has to prove that the idea was to possess

9    the drugs.

10     Now to "possess" something means that you could

11    control it, it means that you could carry it around, you

12    could put it somewhere, but it also means you could

13    stash it, you could go and get it and distribute it

14    later, but you exercise control over it, you "possess"

15    it.  But "possess" with the intent to distribute it,

16    that is that the idea here is to pass that drug, those

17    drugs, on to other people.

18     Now usually that means to sell it, the drug trade,

19    but they don't have to prove the idea was to sell it,

20    just that you possessed it with the idea of passing it

21    on.  And the charge is that the idea was actually to do

22    it.  And having charged specifically the drug, they have

23    to prove that, they have to prove that your idea was to

24    get control over it, get your hands on it, to possess

25    with intent to distribute and distribute 400 grams or

1    more of fentanyl.

2        Now for conspiracy they don't have to prove you

3    did it, they just have to prove that you conspired to do

4    it the way I explained it to you.

5        Do you understand?

6        THE DEFENDANT:  Yes, I understand.

7        THE COURT:  Now that's Count 1, but there are

8    three other counts, Counts 7, 8, and 9, and, um, these

9    counts charge you with doing it on three separate

10   occasions, they charge you with doing it, that is

11   possession with intent to distribute, just the way I've

12   explained it, and distribution of fentanyl on three

13   separate occasions.

14       And on Count 8, because it makes a difference to

15   the sentence, the government has charged and has to

16   prove that the distribution was of 40 grams or more of

17   fentanyl.  And on Count 9, the government has charged,

18   and so they have to prove, that the possession with

19   intent to distribute -- not that you actually did it,

20   but you possessed it with intent to distribute, 400

21   grams or more of fentanyl.  And the drug has to be more

22   than trace elements of that drug in the mixture, um, the

23   amount that they have to prove.

24       Do you understand?

25       THE DEFENDANT:  Yes, I understand.

1        THE COURT:  So those are the charges.  Now let's

2   talk about what your rights are.

3        You have the right, on each of those four charges,

4   to a fair and an impartial trial before a jury.  Now you

5   have something to say about who sits on that jury, and

6   they will be the judges, and you exercise that right

7   through Ms. Barsky, your attorney, and Mr. Fick -- your

8   attorneys.

9        At that trial you have the right to be present

10   right here in the courtroom to watch the witnesses as

11   they testify, but equally or more important than that,

12   you can have your attorneys question those witnesses,

13   make arguments on your behalf, call witnesses on your

14   behalf, and introduce evidence on your behalf.  You can

15   testify on your own behalf.  But equally you have the

16   right not to do a thing, call any witnesses, and

17   certainly you don't have to testify, and you don't have

18   to have your attorneys say a single thing, and that can

19   never count against you because the government made

20   these charges, the government has to prove these charges

21   beyond a reasonable doubt to the jury unanimously.  And

22   I tell them that you start the trial, I'll say

23   "Ms. Betances is innocent, she's an innocent woman," and

24   I will explain that to the jury at the outset of the

25   trial.  And I'm not giving you anything when I tell you

1    this, these things are your rights under the

2    Constitution.

3            Do you understand?

4            THE DEFENDANT:  Yes, I understand.

5            THE COURT:  If you plead guilty, all those rights

6    are gone.  You'll never have a trial, you'll never get

7    to see the evidence against you, I'll ask the government

8    attorney to tell me what he hopes he can prove and that

9    as close to evidence as we're going to come.

10           You still don't have to tell anyone about anything

11   or say anything about these crimes until I sentence you,

12   but once I sentence you -- and it wouldn't be today, but

13   at an appropriate time, but once I sentence you, then

14   your right to be silent is gone.

15           Now you're not the only person charged here,

16   Mr. Sanchez is charged, so if he goes to trial after I

17   sentence you, you can be called as a witness.

18           Do you understand that?

19           THE DEFENDANT:  Yes, I understand.

20           THE COURT:  Now let's talk now about what may

21   happen to you if you plead guilty.

22           But the last thing I should say in terms of your

23   rights is if you plead guilty here today, then I stop

24   thinking of you as an innocent person and I think you're

25   guilty, you understand that, and all that remains -- not

1 today but at an appropriate time, is what sentence I

2 will impose upon you.

3 Do you understand?

4 THE DEFENDANT: Yes, I understand.

5 THE COURT: Now let's talk about what may happen

6 to you.

7 (Pause.)

8 THE COURT: Now, Mr. Yeager, you've charged

9 certain quantities which you'll have to prove, but are

10 there other enhancements that I should know about?

11 MR. YEAGER: No, your Honor, not beyond the drug,

12 um -- beyond the drug weight with the associate counts,

13 there are no other enhancements.

14 And I want to take this point -- when you hear me

15 read the facts that -- the core facts that Ms. Betances

16 has signed, you'll see that there's a statement that

17 Ms. Betances "directed" Mr. Sanchez. I want to be clear

18 that when we used that language -- and this is something

19 that I also said in the plea of Mr. Sanchez, that the

20 government is not seeking a managerial role with regard

21 to Mr. Betances or Mr. Sanchez, they were acting as

22 equals in the course of this conspiracy. And that's

23 what the government would prove had it gone to trial.

24 THE COURT: Thank you.

25 It appears you've entered into a plea agreement

1    with the government.  I'm going to ask you about that.

2    But I'm not part of that and I don't -- I'm not

3    permitted under the rules to bargain with you and I

4    don't.  So you need to know -- while you're still

5    innocent you need to know the worst that can happen to

6    you, and I'm -- and to find that out I'm going to turn

7    to the government's lawyer and ask him what is the top

8    of the sentencing guidelines without anything that goes

9    in your favor?  And then I'm going ask him what the

10   sentencing guidelines will advise if you get credit for

11   pleading guilty, a discount for that, and, um, anything

12   else that is in your favor?

13           So you listen to what he has to say.  And it

14   doesn't mean that at sentencing I'm going to listen just

15   to him, I'm not, I'm going to listen to your attorney

16   too.  And I've looked at this plea agreement and I

17   understand that your attorneys will make various

18   arguments for you, but I am not expressing any view on

19   those arguments now.

20           Absent a safety-valve proffer -- has that been

21   explained to you, the safety valve?

22           (Pause.)

23           THE DEFENDANT:  Yes.  Is that what I did?

24           THE COURT:  Well absent my giving you credit for

25   that, if you plead guilty, I have to send you to prison

```
1    for 10 years -- 120 months.

2          You understand that?

3          THE DEFENDANT:  Yes, I understand.

4          THE COURT:  All right.  Now -- but that's the

5    bottom, so I'm going to ask Mr. Yeager what the top of

6    the sentencing guidelines are if everything works out

7    the way he thinks it would work out and then I'm going

8    to ask him what the range is if we assume that the

9    bottom was a 10-year minimum-mandatory sentence.

10         Mr. Yeager?

11         MR. YEAGER:  Thank you, your Honor.

12         The maximum guideline range on this particular

13   case would have been --

14         THE COURT:  Wait.  Wait.  Wait for the

15   interpreter.

16         MR. YEAGER:  Oh, I'm sorry.

17         THE INTERPRETER:  I'm sorry, your Honor.  The

18   defendant's asking if she can wear the headset?  She can

19   hear better with it.

20         THE COURT:  Of course.

21         (Defendant puts on headset.)

22         THE COURT:  Go ahead.

23         MR. YEAGER:  Thank you.

24         All set?

25         (Pause.)
```

1          MR. YEAGER:  Thank you, your Honor.

2          The maximum guideline range for the offense, if

3     Ms. Betances went to trial, would have been a 30,

4     because at least 400 grams, but less than 1.2 kilograms

5     of fentanyl, are attributable to the defendant pursuant

6     to the United States Sentencing Guidelines Section

7     2(d)(1.1)(5).  With a 30, and without consideration of

8     acceptance, the range would have been 97 to 121 months.

9          Now there is a 10-year minimum mandatory in this

10    particular case for two of the counts, which would have

11    been 120 months.

12         THE COURT:  So really, um -- well I understand

13    what you said.  Thank you.

14         Ms. Betances, absent the safety-valve provision,

15    if you plead guilty to these charges, I have to send you

16    to prison for 10 years -- 120 months, and I can send you

17    to prison for up to 121 months.

18         Do you understand that?

19         THE DEFENDANT:  Yes, I understand.

20         THE COURT:  Now here we've made mention of a plea

21    agreement.

22         (Pause.)

23         THE COURT:  And would you take a look at this.

24    This one that I'm passing you is not signed.

25         But do you recognize that as your plea agreement,

1   that document?

2       THE DEFENDANT:  Yes.

3       THE COURT:  And in fact the Clerk gives me a

4   signed copy here.

5       Did you have that agreement read to you before you

6   signed it?

7       THE DEFENDANT:  Yes.

8       THE COURT:  Did you talk it all over with

9   Ms. Barsky or Mr. Fick or both of them?

10       (Pause.)

11       THE DEFENDANT:  Would you repeat the question?

12       THE COURT:  Have you talked it all over, the plea

13   agreement, what it says, what it provides, have you

14   talked it all over with your attorneys, Ms. Barsky,

15   Mr. Fick, or both of them?

16       THE DEFENDANT:  Yes, I have.

17       THE COURT:  And after you've talked it over, do

18   you think you understand it?

19       THE DEFENDANT:  Yes.

20       THE COURT:  I have been given a signed copy here.

21   May I have that?  Take look at this.

22       Is that your signature on that page there?

23       THE DEFENDANT:  Yes.

24       THE COURT:  And you signed that after you

25   understood what it provides?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Thank you.

3          Now I want you to know that as I read this what

4     the government is agreeing to here is that they will

5     recommend that you go to prison for the lowest time that

6     the sentencing guidelines provide.

7          You understand that?

8          THE DEFENDANT:  Yes, I understand.

9          THE COURT:  And at least as I'm hearing today, the

10    lowest is 10 years -- 120 months.

11         You're clear on that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  I do see where you're saying -- when

14    you signed it, and the government understands that this

15    is what your attorneys will do, that they will argue

16    that under the law I need not impose the sentence that

17    is the 10-year minimum mandatory and that I can go

18    lower.  I do understand that.  I don't know how that's

19    going to come out today.

20         Are you clear on that?

21         THE DEFENDANT:  Yes, I understand.

22         THE COURT:  I mean I will follow the law, but I'm

23    not bargaining and I cannot say any more today.

24         You're clear?

25         THE DEFENDANT:  Yes, I understand.

1      THE COURT:  Now these are drug crimes and under

2  the law a person who pleads guilty to drug crimes, I'm

3  supposed to take them into custody today, right now, you

4  don't leave the courtroom, you go into custody, unless

5  there are extraordinary circumstances.  Now I understand

6  your lawyers are going to suggest that there are, but

7  I'm not expressing any view on that, we'll see if you

8  plead guilty.

9      But you understand that's the law?

10      THE DEFENDANT:  Yes, I understand.

11      THE COURT:  And let me ask you this.  Other than

12  this plea agreement that -- well the Clerk has told me,

13  and I guess, Mr. Yeager, it's not inappropriate to ask

14  you this.

15      On this business about having her taken into

16  custody today, the Clerk said you would not object to

17  that.  And I take it that's a promise and I should ask

18  her.  But is that correct?

19      MR. YEAGER:  Yes, I understand the Court's

20  question.  Yes, the government has agreed that we will

21  not -- and to be honest with you, it was not negotiated,

22  but I think it's a fair request, so just evaluated on

23  the request, that it's given the fact that Ms. Betances

24  is a mother of four young children, two very young

25  children.  And there are other factors as well, if the

```
 1    Court --
 2         THE COURT:  Well I'm not getting there, but you
 3    have conveyed that to defense counsel?
 4         MR. YEAGER:  Yes, your Honor.
 5         THE COURT:  All right.
 6         So they've agreed that if you plead guilty they
 7    won't object to your remaining on release terms pending
 8    your sentencing.  But I'm not saying what I'm going to
 9    do because you haven't pled guilty yet.  But that's a
10    promise.
11         So other than that promise, has anyone made you
12    any promise of any sort, beyond that, that's not here in
13    this plea agreement that I've seen?
14         THE DEFENDANT:  No.
15         THE COURT:  Has anyone threatened you with
16    anything to get you to plead guilty?
17         THE DEFENDANT:  No.
18         THE COURT:  Now two people are charged here.  Are
19    you covering up for someone else by pleading guilty
20    yourself?
21         THE DEFENDANT:  No.
22         THE COURT:  These crimes are felonies.  If you
23    plead guilty to these crimes, never again would you --
24    in your life, would you be permitted to have a firearm
25    or ammunition.
```

1          Do you understand that?

2          THE DEFENDANT:  Yes, I understand.

3          THE COURT:  And if you're not a citizen of the

4     United States, pleading guilty to these crimes may have

5     the consequence of your being deported from the United

6     States, denied admission under the laws of the United

7     States, denied naturalization under the laws of the

8     United States.

9          Do you know that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Now have you had enough time to talk

12     all this over, pleading guilty, have you -- have you had

13     enough time to talk all this over with your attorneys,

14     Ms. Barsky and Mr. Fick?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you think they've been good

17     attorneys for you, gotten for you those things that are

18     your rights under the law?

19          THE DEFENDANT:  Yes, very good.

20          THE COURT:  Are you satisfied with their

21     representation of you?

22          THE DEFENDANT:  Yes.

23          THE COURT:  You still want to plead guilty?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Why?

1          THE DEFENDANT:  Because I am.

2          THE COURT:  All right.

3          Now I'm going to turn to Mr. Yeager and have him

4    tell me what he hopes he can prove.  I see there's a

5    statement of facts here, but I'd like him to tell me

6    what he, um, hopes he can prove if we went to trial.

7    You listen to it because I'm going to ask you whether

8    it's true.

9          MR. YEAGER:  Your Honor, before I do may I just

10   make one point that I think the Court would want to

11   know?  And I point out that there's no one in the

12   courtroom when I say this.  And we do not have an

13   agreement on this, but I think it's something that

14   should be on the record and that the Court would want to

15   inquire about it.

16          THE COURT:  Yes.

17          (Sealed portion excised out.)

18          THE COURT:  Now could you explain to me what you

19   could prove if the case went to trial.

20          MR. YEAGER:  Yes, your Honor.

21          Ms. Betances has signed the core agreement of

22   facts, but this is the government's perspective, a

23   broader perspective of what the government would prove

24   had the case proceeded to trial.

25          Between March of 2020 and September of 2020, the

1    DEA cross-border initiative conducted 7 controlled buys

2    of fentanyl from a Drug-Trafficking Organization, or

3    "DTO," operating in Massachusetts and in the Dominican

4    Republic.  For each controlled purchase, an agent

5    working undercover, the UC, placed an order for fentanyl

6    by phone.  After receiving the order and negotiating the

7    price to be paid, the DTO then dispatched co-defendant,

8    Luis Miguel Sanchez, or "Sanchez," to deliver the

9    narcotics.

10        The DTO used two different customer lines during

11   the course of the investigation.  The Customer Line

12   Telephone 1 was used to arrange the first five

13   controlled buys, March 10th, March 16th, July 9th, July

14   15th, and July 30th.  In August, the DTO dropped

15   Customer Telephone 1.  The last two controlled buys

16   alleged in the conspiracy were arranged on Customer

17   Telephone 2, August 14th, and September 3rd.

18        While arranging the August 14th, 2020 controlled

19   buy, the agents recorded a call with the woman that

20   answered Customer Telephone 2.  Agents believed they

21   recognized the voice of the woman as that of the

22   defendant, Yohanna Madelenny Betances.  Aware that the

23   DEA had previously recorded Betances in connection with

24   a 2017 drug investigation, agents requested a Dominican-

25   born agent to make a voice comparison.  Thereafter the

1    agents determined that during multiple recordings the

2    DEA undercovers were conversing with the same person,

3    Ms. Betances.

4         On August 20th, 2020, agents obtained a

5    precise-location warrant for Customer Telephone 2.

6    However, despite being used to arrange controlled buys

7    in the District of Massachusetts on August 14th and

8    September 3rd, Customer 2, Telephone 2, was not in

9    network, meaning that the phone was not in the United

10   States.  Even though Customer Telephone 2 was out of the

11   country, agents repeatedly set up surveillance at

12   Betances's apartment complex throughout the

13   investigation.  Agents conducting such surveillance

14   observed the co-conspirator Sanchez stop at Betances's

15   apartment for a short period of time just prior to four

16   of the controlled buys, July 15th, July 30th, August

17   14th, and September 3rd, 2020.

18        On September 3rd, 2020, an agent posing as a

19   repairman observed Sanchez sitting on the floor outside

20   Betances's apartment, the defendant appeared to be --

21   the co-conspirator appeared to be waiting for someone to

22   let him into the apartment.  Approximately 30 minutes

23   later, the defendant, Mr. Sanchez, was observed leaving

24   the Betances apartment building carrying a black garbage

25   bag.  Mr. Sanchez then entered a parked Mercedes and

1    drove away.

2          10 minutes later, Sanchez left -- 10 minutes after

3    Sanchez left Betances's apartment, a UC received a text

4    from an out-of-network Customer Telephone 2, which

5    identified a meeting location.  Minutes later, Sanchez

6    arrived driving the same Mercedes.  After meeting the UC

7    near the arranged location, Sanchez handed over

8    approximately 40 grams of fentanyl in exchange for $800

9    in marked currency.

10          Four days after the September 3rd, 2020 deal, on

11   September 11th, 2020, Ms. Betances arrived in the United

12   States on a flight from the Dominican Republic.  Minutes

13   after, Ms. Betances landed at Logan Airport.  Customer

14   Telephone 2 registered in network and immediately began

15   pinging.  Thereafter, location data showed Customer

16   Telephone 2 traveling from Logan Airport to the Lawrence

17   area of Betances's apartment, Lawrence and Methuen.  The

18   phone then regularly pinged at or near the Betances

19   apartment over the course of the next several days.

20          On September 17th, 2020, during the execution of a

21   search warrant at the Betances apartment, the DEA seized

22   Customer Telephone 2 from Betances's bedroom.  In

23   addition, agents seized 776.862 grams of fentanyl.  Most

24   of the fentanyl was found hidden under a false bottom of

25   an armed water cooler inside a closet in Betances's

bedroom.  The cooler held nearly 2,000 grams of lactose,
2 digital scales, and approximately 769.114 grams of
fentanyl.  Drugs found inside the cooler included 17.114
grams of fentanyl found in three clear plastic bags,
78.2 grams of a mixture of fentanyl, and something
called AMPP packaged in one clear-packaged bag, and
673.8 grams, a mixture of fentanyl and AMPP, packaged in
multiple plastic units.

    After acknowledging her *Miranda* rights on the day
of her arrest, Betances stated that she was 4-months
pregnant with twins.  In addition, she identified two of
the minor children found in the apartment as her
daughters.  Betances told agents that she lived in Santo
Domingo and traveled to the U.S. for vacations and
medical appointments.

    At the time of her arrest, Betances did not admit
to the drugs found in the apartment, however she stated
that she was in the DR and that she directed Sanchez to
manage her drug distribution business.  And when I say
"directed," as I said before, the government does not
assert that Ms. Betances was the manager here, she has
an equal relationship with Mr. Sanchez.  Ms. Betances
stated that she provided Sanchez with keys to the
apartment.

    With regard to the drug weight, the total drug

1     weight, approximately 852.684 grams of fentanyl, which

2     was being concealed, is directly attributable to the

3     defendant.  This is a summary of the government's case,

4     your Honor.

5         THE COURT:  Thank you.

6         MR. YEAGER:  In addition, I will state for the

7     record, your Honor, that Ms. Betances had participated

8     in a safety-valve proffer and the government believes

9     that that safety-valve proffer was accurate and

10    truthful.

11        THE COURT:  Thank you.

12        Did you hear what Mr. Yeager had to say?

13        THE DEFENDANT:  Yes.

14        THE COURT:  Do you understand it?

15        THE DEFENDANT:  Yes.

16        THE COURT:  Are those things true as they pertain

17    to you?

18        THE DEFENDANT:  Yes.

19        THE COURT:  So as I understand it, you're pleading

20    guilty to these four counts because you recognize in

21    fact you are guilty, is that right?

22        THE DEFENDANT:  Yes, correct.

23        THE COURT:  I find that Yohanna Madelenny Betances

24    knowingly, intelligently, and voluntarily, exercises her

25    right to plead guilty and the Clerk may accept the plea.

1        This is the most important part.  The Clerk will

2    say to you "You've earlier pleaded not guilty, do you

3    want to change your plea from not guilty to guilty?"  If

4    you want to plead guilty, tell her "Yes."  If you want

5    to stop and go to trial, tell her "No."  If you say

6    "Yes," she will say to you, "How do you now plead,

7    guilty or not guilty?"  If you plead guilty when the

8    Clerk is asking you, you're guilty, no taking it back or

9    starting over.

10        Do you understand?

11        THE DEFENDANT:  Yes, I understand.

12        THE COURT:  The Clerk may accept the plea.

13        THE CLERK:  Ms. Betances, you have previously pled

14    not guilty to a 4-count indictment charging you, within

15    Count 1, to conspiracy to distribute and to possess with

16    intent to distribute 400 grams or more of fentanyl, in

17    violation of Title 21, the United States Code Section

18    846, in Count 7, to distribution and possession with

19    intent to distribute fentanyl, in violation of Title 21,

20    United States Code, Section 841(a)(1) and (b)(1)(C), and

21    in Count 8, to distribution of and possession with

22    intent to distribute 40 grams or more of fentanyl, in

23    violation of Title 21, United States Code, Sections

24    841(a)(1) and (b)(1)(B)(6), and in Count 9, possession

25    with intent to distribute 400 grams or more of fentanyl,

1    in violation of Title 21, United States Code, Sections

2    841(a)(1) and (b)(1)(A)(6).

3         Do you now wish to change your plea, "Yes" or

4    "No"?

5         THE DEFENDANT:  Yes, to guilty.

6         THE CLERK:  How do you now plead to Counts 1, 7,

7    8, and 9, guilty or not guilty?

8         THE DEFENDANT:  Guilty.

9         THE COURT:  Thank you.  You may step down.

10        (Steps down.)

11        THE COURT:  I propose sentencing for Wednesday the

12   6th of November at 2:00 p.m.

13        Is that satisfactory?

14        MR. YEAGER:  Yes, your Honor.  Thank you.

15        THE COURT:  And, Ms. Barsky?

16        MS. BARSKY:  Yes, your Honor.

17        THE COURT:  Very well.

18        I understand, because Mr. Yeager has spoken to it,

19   grounds to have her remain on supervised -- while it

20   isn't technically supervised release, but to remain at

21   liberty under terms.  I do find that that's appropriate

22   in the circumstances of this case.  The same conditions

23   of bail will obtain.

24        Ms. Barsky, will you undertake to have

25   Ms. Betances promptly interviewed by probation so that a

1    full presentence report may be prepared?

2          MS. BARSKY:  Yes, your Honor, we will.

3          THE COURT:  Thank you.  Very well.  We'll stand in

4    recess.

5          (Ends, 10:15 a.m.)

6

7                    C E R T I F I C A T E

8

9          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

10   hereby certify that the forgoing transcript of the

11   record is a true and accurate transcription of my

12   stenographic notes, before Judge William G. Young, on

13   Thursday, July 25, 2024, to the best of my skill and

14   ability.

15

16

17

18

19   /s/ Richard H. Romanow 09-16-24

20   _____
     RICHARD H. ROMANOW  Date

21

22

23

24

25